UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

CLAUDE GRAHAM,

                    Plaintiff,

v.

CITY OF NEW YORK, THE NEW YORK
CITY ADMINISTRATION FOR
CHILDREN'S SERVICES, JANET
CAESAR a/k/a JANET CAESAR-
BALFOUR, and EILEEN TREACY, PH.D,

                    Defendants.

AMENDED MEMORANDUM,
ORDER, & JUDGMENT

11-CV-5747



FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.
★ JUN 1 4 2012 ★
BROOKLYN OFFICE

APPEARANCES:

For the plaintiff:                    Steve Marchelos
                                      87 Mineola Blvd.
                                      Mineola, NY 11501

For defendants the City of New York, the New        Eric Brent Porter
York City Administration of Children's              New York City Department of Law
Services, and Janet Caesar a/k/a Janet Caesar-      100 Church Street
Balfour:                                            New York, NY 100007

                                      Martha Anne Calhoun
                                      New York City Department of Law
                                      100 Church Street
                                      New York, NY 100007

For defendant Dr. Eileen Treacy:      Joseph David La Cava
                                      Garson DeCorato & Cohen, LLP
                                      110 Wall St., 10th Floor
                                      New York, NY 10005

JACK B. WEINSTEIN, Senior United States District Judge:

I.    Introduction ............................................................................................................ 2

II.   Facts ........................................................................................................................ 5

1

A.   Relationship Between Graham and JGR ................................................................ 6

B.   Initial ACS Investigation ..................................................................................... 6

C.   Complaints About Investigation .......................................................................... 7

D.   JGR Confirms Abuse and Recants ...................................................................... 7

E.   First Order of Protection Issued Against Plaintiff ............................................. 7

F.   Forensic Evaluation by Defendant Dr. Treacy .................................................. 8

G.   Family Court Case Filed Against Plaintiff ......................................................... 9

H.   Claims Against Mother Dismissed .................................................................... 10

I.   Plaintiff Denied Contact with His Son .............................................................. 10

J.   Petition Against Plaintiff Dismissed ................................................................. 11

III.   Procedural History ..................................................................................................... 11

IV.   Motion to Dismiss Standard ..................................................................................... 11

V.   *Rooker-Feldman* Does Not Bar Consideration of Plaintiff's Claims ..................... 12

VI.   Claims Against ACS Dismissed ................................................................................ 14

VII.   Claims Against the City of New York, Janet Caesar, and Dr. Treacy Are Without
Merit ........................................................................................................................... 14

1.   Due Process .................................................................................................. 15

    a. Procedural Due Process ............................................................... 16
    b. Substantive Due Process .............................................................. 17

2.   Unreasonable Search and Seizure ............................................................. 24

3.   Malicious Prosecution ................................................................................ 27

4.   Equal Protection ......................................................................................... 28

B.   Supplemental Jurisdiction Over State Law Claims ........................................... 29

VIII.   No Amendment of Pleadings Permitted .................................................................... 30

IX.   Conclusion .................................................................................................................. 33

I.   **Introduction**

This case illustrates the adage "justice delayed is justice denied."  While the Family

Court and the City, through its employees and consultant, took years to investigate charges of

neglect against a child's father, completely separating the son and parent during the process, the

youngster grew estranged from his absent dad.  Although the charges against him were

dismissed, the sire had effectively lost the son. The law regrets the harm caused by its sloth. But no violation of the constitutional or statutory rights of the plaintiff was committed, so the complaint must be dismissed.

In March 2006, the New York City Administration for Children's Services ("ACS"), an agency of the City of New York, began investigating plaintiff's wife after it received allegations from a person other than the plaintiff that she physically and sexually abused her children. In the course of its investigation, an ACS caseworker, Janet Caesar ("Caesar"), conducted four interviews with plaintiff's son, JGR, then seven years old. In the first two interviews, JGR denied all allegations of abuse; in the third interview, he stated that his mother was abusing him; in the fourth, he recanted his accusation and claimed that his father, plaintiff Claude Graham, had coached him to say that he was being abused. At the request of ACS, a Family Court judge issued an order of protection forbidding Graham from seeing JGR and instructed the agency to investigate the father and consider filing a petition against him. That JGR was coached by his father to falsely report the abuse was the opinion later reached by a forensic psychologist, Dr. Eileen Treacy.

For almost a year, the initial temporary order of protection forbade Graham from seeing his son, and the case against JGR's mother remained open, yet allegedly little was done to investigate the claims against them. Plaintiff repeatedly complained to officials that ACS was not taking swift and adequate steps to look into the alleged abuse. He claims that, in retaliation for these complaints, a Family Court petition was filed against him, alleging that he emotionally neglected JGR by coaching him to fabricate the abuse allegations. He claims that the defendants lacked sufficient evidence to initiate the proceedings against him and sought to cover up their prior inactivity by manufacturing the charges.

3

The Family Court case against the plaintiff lasted for almost three years.  At the request of ACS, during the pendency of the case, Graham was subject to temporary orders of protection that severely limited or completely barred him from having contact with his son.  Although the cases were ultimately dismissed with prejudice against both parents, the damage to the father's relationship with his son was devastating.

Plaintiff now sues the City of New York, ACS, and Caesar (collectively "the City Defendants"), as well as Dr. Treacy, alleging:

- Violations of his rights:
  - To be free from unreasonable searches and seizures;
  - To procedural and substantive due process; and
  - To equal protection
  under the New York state and federal constitutions and 18 U.S.C. § 1983;
- Malicious prosecution under 18 U.S.C. § 1983 and state law;
- Abuse of process;
- Negligent and intentional infliction of emotional distress; and
- Negligent hiring and supervision.

*See* Compl. ¶¶ 83-180, Doc. Entry 1, Nov. 23, 2011 ("Compl.").  He seeks declaratory relief, compensatory damages, punitive damages, attorney's fees, and costs and disbursements.  *See id.*

The City Defendants move to dismiss all claims, alleging that the *Rooker-Feldman* doctrine deprives the court of subject matter jurisdiction to hear the case; that plaintiff has failed to state claims on which relief can be granted, including failure to allege a policy or practice triggering municipal liability under *Monell v. New York City Dep't of Soc. Servs.,* 436 U.S. 658 (1978); and that Caesar is entitled to qualified and absolute immunity.  *See generally* Mem. of L. in Supp. of City Defs.' Mot. to Dismiss the Compl., Doc. Entry 12, Feb. 17, 2012 ("Defs.' Mem.").

The motion to dismiss the case is granted.  Plaintiff's pleadings fail to support a claim that his federal constitutional rights were violated by any of the defendants.  Child protective

services must strike a delicate balance between protecting children from abuse and neglect and avoiding unnecessary family disruptions. Caseworkers must make difficult, immediate decisions, often with limited information. Once a child protective proceeding against a parent is initiated, it can be unnecessarily prolonged due to inadequate resources or staffing. While the alleged inefficiency of the agency in this case may have been lamentable, it is not unconstitutional. Although defendant Dr. Treacy has not moved, all claims against her are dismissed for the same reasons the other defendants' motions are granted.

## II. **Facts**

In addition to the facts alleged in the complaint, the Family Court petitions and orders attached to defendants' moving papers, as well as the Family Court docket entries submitted by the plaintiff, are considered in deciding this motion. A court generally may not consider documents outside the pleadings on a motion to dismiss. *Leonard F. v. Israel Discount. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) ("In adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." (internal citations and quotations omitted)). It may, however, consider both documents incorporated into the complaint by reference and matters of which judicial notice may be taken without converting the motion into one for summary judgment. *See, e.g., Nechis v. Oxford Health Plans, Inc.*, 421 F.3d 96, 100 (2d Cir. 2005) (finding that documents incorporated by reference may be considered on a motion to dismiss); *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (finding that courts may properly consider "matters of which judicial notice may be taken, or documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit"). As the petition is referred to

5

explicitly in the complaint, was in the plaintiff's possession, and was relied on by him in pleading, it is incorporated by reference and may be considered at this stage. Records of prior litigation are facts of which judicial notice may be taken. *Anderson v. Rochester-Genesee Reg'l Transp. Auth.*, 337 F.3d 201, 205 n. 4 (2d Cir. 2003) (citing cases). Plaintiff has not objected to consideration of these documents.

While additional documents are now in the record, *see* Part III, *infra,* this evidence is not considered in deciding this motion, *see* Parts III-IV, *infra.*

### A. Relationship Between Graham and JGR

Plaintiff Claude Graham is the father of, JGR, who was born in 1998. Compl. ¶ 25. Graham did not live with the child or the child's mother, although he saw the child frequently and was paying child support. *See* Tr. of Hr'g, May 7, 2012. Graham is married to another woman. *Id.*

### B. Initial ACS Investigation

On March 15, 2006, ACS opened an investigation relating to alleged child abuse and neglect of JGR and his brothers by their mother. *Id.* ¶ 26. The allegations included physical and sexual abuse, unsanitary living conditions, and school absences. *Id.* ¶ 27. The investigation was prompted by a call from Norman McLean, one of JGR's mother's paramours, to the State Central Register of Child Abuse and Maltreatment. *Id.* ¶ 26; Tr. of Hr'g, May 7, 2012.

Janet Caesar was assigned as the ACS caseworker. As part of her investigation, Caesar interviewed JGR about the alleged abuse several times. JGR denied any abuse at an initial interview on March 26, 2006. *Id.* ¶ 29. He again denied the allegations on April 7, 2006. *Id.* ¶ 30. These first two interviews were apparently conducted in the mother's home, but not in her presence. *See id.* ¶ 32; Tr. of Hr'g, May 7, 2012.

### C. **Complaints About Investigation**

The plaintiff complained to ACS and other city officials about the abuse of his son and the failure of the City Defendants to properly investigate. *Id.* ¶ 36. It is unclear to whom he made these complaints, or when, or how frequently.

In April 2006, Graham's wife sent a letter to Mayor Michael Bloomberg and other City officials criticizing ACS for its inactivity and incompetence in investigating the allegations. *Id.* ¶ 37.

### D. **JGR Confirms Abuse and Recants**

On May 5, 2006, Caesar interviewed JGR for a third time—this time, at the child's school. *Id.* ¶ 31. For the first time, JGR claimed that he had, in fact, been abused by his mother. *Id.* He told Caesar that he did not admit the truth previously because his mother was nearby. *Id.* ¶ 32. The child was promptly removed from his mother's custody by ACS. *Id.* ¶ 34; *see also* Decl. of Eric Porter ("Porter Decl.") Ex. C at 6 (Family Court Petition), Doc. Entry 13, Feb. 17, 2012 ("Family Court Petition") (stating that the child was removed on or about May 4, 2006).

Following this interview, the City Defendants filed a petition against the mother in Queens Family Court on May 8, 2006. Compl. ¶ 33. It alleged abuse and neglect.

Caesar interviewed JGR for a fourth time on May 9, 2006, after he had been removed from his mother's care. *Id.* ¶ 34. The child recanted. He said that his father, the plaintiff, had instructed him to lie. *Id.*

### E. **First Order of Protection Issued Against Plaintiff**

Following a hearing on May 11, 2006, a Family Court judge issued a temporary order of protection preventing Graham from having any contact with JGR. Porter Decl. Ex. A (May 11, 2006 Temporary Order of Protection). Graham was represented by counsel at the hearing. Pl.'s

Aff. in Opp. to Converted Mot. for Summ. J. ("Pl.'s Aff.") Ex. C (Family Court Docket Entry for May 11, 2006), Doc. Entry 32, May 17, 2012. The court also ordered "ACS . . . to investigate the propriety of filing a new child protective proceeding against Mr. Graham." Porter Decl. Ex. A (May 11, 2006 Temporary Order of Protection).

JGR was returned to his mother's custody on May 12, 2006, approximately eight days after he had been removed. Compl. ¶ 35; *see also* Family Court Petition 6 (stating that the child was returned on or about May 12, 2006).

Plaintiff did not appeal the temporary order of protection. *See* N.Y. Fam. Ct. Act § 1112(a) (permitting appeal of such orders).

### F. Forensic Evaluation by Defendant Dr. Treacy

In 2007, the ACS investigation of JGR's mother was still ongoing. In February of that year, the City Defendants retained defendant Dr. Treacy, a developmental psychologist, to conduct a forensic evaluation, assessing the validity of the sexual abuse allegations. Compl. ¶¶ 19, 38-39. Alleged is that this evaluation was conducted in response to pressure by plaintiff. *Id.* ¶ 38.

Dr. Treacy interviewed JGR on February 9, 2007 and March 23, 2007. *Id.* ¶ 40. In her March 28, 2007 report summarizing her findings, Treacy concluded that Graham had coached JGR to state that his mother had abused him—information which would support a finding of neglect by the plaintiff rather than the mother. *Id.* ¶¶ 42-43, 57-58.

Plaintiff contends that this evaluation was so fatally flawed as to be grossly negligent and improper. *Id.* ¶¶ 57, 60. Alleged is that it failed to provide any evidence that JGR's physical, mental, or emotional condition had been impaired or was in imminent danger of being impaired—a necessary element of a neglect finding against him. *Id.* ¶¶ 58-59. Claimed is that

this evaluation was so flawed that the City Defendants should have known that it was unreliable and insufficient to support a charge of neglect. *Id.* ¶ 62.

Graham concedes that he did not know Dr. Treacy and is not claiming that she had any specific animus towards him. *See* Tr. of Hr'g, May 7, 2012.

### G. Family Court Case Filed Against Plaintiff

On March 29, 2007, the Family Court again ordered that there should be no contact between JGR and Graham until authorized by a further order of the court. Porter Decl. Ex. B (March 29, 2007 Temporary Order of Protection).

On April 13, 2007, the City Defendants filed a neglect petition against Graham on the ground that he coached or coerced JGR into making false allegations against his mother and that this constituted emotional neglect. Compl. ¶ 45; *see also* Family Court Petition. That same day, they filed a second petition alleging both emotional neglect by plaintiff and sexual abuse and neglect by JGR's mother. Compl. ¶ 46; *see also* Family Court Petition.

Plaintiff denies the allegation of coaching. Compl. ¶ 74. He contends that there was no factual basis to support the charges against him. *Id.* ¶ 52. He claims that JGR's multiple contradictions and recantations made his statements untrustworthy. *Id.* Alleged is that the statements were uncorroborated, *id.* ¶ 55, and that Dr. Treacy's flawed forensic evaluation did not adequately support JGR's charge. *Id.* ¶¶ 56-57. The City Defendants, he suggests, knew that an uncorroborated statement from a child could not be the basis of a neglect finding. *id.* ¶ 56.

Graham asserts that the petition was filed against him in retribution for his complaints about the City Defendants and for the letter his wife sent to the Mayor. *Id.* ¶¶ 66-67. The gravamen of his charge is that the City Defendants sought to punish him in order to cover up the breach of their own procedures, including their failure to obtain a proper forensic evaluation of

9

JGR until nearly a year after the investigation began, and their failure to present the allegations of abuse by the mother to the local Children's Advocacy Center. *Id.* ¶¶ 68-70.

### H. **Claims Against Mother Dismissed**

JGR remained in his mother's custody after the second petition against her was filed on April 13, 2007. *Id.* ¶ 47. On April 18th, defendants withdrew the sexual abuse allegations against her and agreed to an adjournment in contemplation of dismissal of the remaining neglect charges. *Id.* ¶ 49. All charges against JGR's mother were dismissed a year later. *Id.* ¶ 50.

### I. **Plaintiff Denied Contact with His Son**

After the petition was filed against him, the Family Court issued another temporary order of protection prohibiting Graham from having contact with his son. Porter Decl. Ex. D (April 13, 2007 Temporary Order of Protection). A series of similar orders followed. Porter Decl. Ex. E (Temporary Orders of Protection from April 18, 2007 to October 1, 2007). Plaintiff alleges that these orders were requested by Caesar. Pl.'s Mem. of L. in Opp. to the City Defs.' Mot. to Dismiss the Compl. 48, Doc. Entry 19, Mar. 21, 2012 ("Pl.'s Mem.").

In October 2007, the plaintiff was permitted to visit with his son under supervision. Porter Decl. Ex. F (Temporary Orders of Protection from October 29, 2007 to May 20, 2010). In an order dated June 2, 2009, the Family Court noted that these visits had a negative effect on the mental health of JGR. Porter Decl. Ex. G (Family Court Order on Motion June 2, 2009).

It was due to these orders, issued at the behest of the City Defendants, that plaintiff was unable to have lawful and unimpeded contact with his son until April 10, 2010. Compl. ¶ 72; Porter Decl. Exs. E, F (Temporary Orders of Protection from April 18, 2007 to May 20, 2010). As a result, what had previously been what plaintiff describes as a loving relationship with the child was seriously disrupted. *See* Tr. of Hr'g, May 7, 2012.

### J.  Petition Against Plaintiff Dismissed

On August 26, 2010, the neglect petition against Graham was dismissed without qualification and with prejudice. *Id.* ¶ 71.

### III.   Procedural History

Plaintiff filed a complaint in the Eastern District of New York on November 23, 2011. *See id.* Defendants moved to dismiss the action pursuant to Rule 12(b)(6) on February 15, 2012. *See* Defs.' Mem.  In order to determine whether conversion of the City Defendants' motion to dismiss to one for summary judgment was appropriate, defendants were asked to submit the full case records from the underlying ACS investigation and Family Court action. *See* Order, Doc. Entry 20, Apr. 4, 2012.

At the May 7, 2012 hearing, both plaintiff and Mrs. Caesar testified without objection. *See* Tr. of Hr'g, May 7, 2012.  The parties were permitted to submit supplemental letter briefs on the facts raised at the hearing. *See id.*  Plaintiff supplied additional documents in further opposition to defendants' motion. *See* Doc. Entry 32, May 15, 2012.

Plaintiff has opposed conversion to summary judgment at this time. *See* Pl.'s Aff. ¶¶ 2-3. Because the case can be decided based on the pleadings, conversion of the defendants' motion to one for summary judgment is not appropriate.

### IV.   Motion to Dismiss Standard

Rule 12(b)(6) allows dismissal of claims when the pleadings fail "to state a claim upon which relief can be granted."  In ruling on a 12(b)(6) motion, a court must accept all factual allegations in the complaint as true and draw all reasonable inferences in plaintiff's favor. *Hayden v. Paterson*, 594 F.3d 150, 160 (2d Cir. 2010). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support

11

the claims." *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974). While plaintiffs are not required to put forward "detailed factual allegations," a pleading that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic v. Twombly,* 550 U.S. 544, 555 (2006). A claim survives a motion to dismiss if it is "plausible on its face." *Id.* at 570. By contrast, "[a] complaint which consists of conclusory allegations unsupported by factual assertions fails even the liberal standard of Rule 12(b)(6)." *De Jesus v. Sears Roebuck & Co.,* 87 F.3d 65, 70 (2d Cir. 1996), *cert. denied* 519 U.S. 1007 (1996).

## V. *Rooker-Feldman* Does Not Bar Consideration of Plaintiff's Claims

*Rooker-Feldman* does not deprive this court of subject matter jurisdiction over plaintiff's claims. It is a "narrow" doctrine prohibiting federal district courts and courts of appeals from reviewing final state court judgments. *Exxon Mobil Corp. v. Saudi Basic Industries Corp.,* 544 U.S. 280, 285 (2005). Its application "is confined to cases of the kind from which the doctrine acquired its name: cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *Id.*

There are four "requirements" for application of *Rooker-Feldman*:

> First, the federal-court plaintiff must have lost in state court. Second, the plaintiff must "complain[ ] of injuries caused by [a] state-court judgment[.]" Third, the plaintiff must "invite district court review and rejection of [that] judgment[ ]." Fourth, the state-court judgment must have been "rendered before the district court proceedings commenced"—i.e., *Rooker-Feldman* has no application to federal-court suits proceeding in parallel with ongoing state-court litigation.

*Hoblock v. Albany County Bd. of Elections,* 422 F.3d 77, 85 (2d Cir. 2005) (alterations in original).

The Court of Appeals for the Second Circuit has held that a plaintiff does not invite rejection of a state court judgment when he seeks to recover for constitutional harms caused by

12

interim state court orders after a case was terminated in his favor. *See Green v. Mattingly*, 585 F.3d 97, 102-103 (2d Cir. 2009). In *Green*, ACS initiated child protective proceedings in Family Court against the plaintiff mother. *Id.* at 99. At an initial hearing, the court issued a temporary order removing the child from her custody. *Id.* at 100. At a second hearing, the child was returned to the mother, and the case was adjourned for twelve months in contemplation of dismissal. *Id.* Following dismissal, plaintiff filed suit in to recover under 18 U.S.C. § 1983 for malicious prosecution. *Id.* The Court of Appeals for the Second Circuit found that her case was not barred by *Rooker-Feldman*. *Id.* at 102-103. The plaintiff was not a "state court loser": although the Family Court issued a temporary order of removal, the child was returned four days later, and the proceedings were ultimately dismissed. *Id.* at 102; *see also V.S. v. Muhammad*, 595 F.3d 426, 430 (2d Cir. 2010) (finding, under similar facts, that plaintiff "V.S. is not a 'state-court loser,' since, prior to the commencement of the instant action, ACS had withdrawn all its claims against V.S. and the Family Court had released T.S. to V.S.'s custody. Likewise, nothing in the instant action invites district court review and rejection of a final state-court judgment."). Moreover, the court found that plaintiff had "plainly has not repaired to federal court to undo the Family Court judgment," since "the only conceivable 'judgment' against plaintiff—the temporary removal of her child—has already been undone." *Green*, 585 F.3d at 102-103 (internal citations and alterations omitted). *Compare Phifer v. City of New York*, 289 F.3d 49, 57 (2d Cir. 2002) (holding that the plaintiff's claims seeking an order directing ACS to return plaintiff's child to her custody were barred by the *Rooker–Feldman* doctrine); *Allen v. Mattingly*, No. 10 CV 0667, 2011 WL 1261103, *8 (E.D.N.Y. Mar. 29, 2011) (holding that there was no jurisdiction under *Rooker-Feldman* where plaintiff's "claims invite this Court to review and reject the state Family Court's determinations to remove her son from her custody and to place

13

him in the custody of a foster care agency, which have not otherwise been vacated, i.e., her son

has not been returned to her custody"); *Puletti v. Patel*, No. 05 CV 2293, 2006 WL 2010809, at

\*5 (E.D.N.Y. July 14, 2006) (finding that *Rooker-Feldman* deprived the court of subject matter

jurisdiction over the complaint where the "Plaintiff request[ed] that th[e] Court restore his lost

Thursday night visitations because he [wa]s unsatisfied with the outcome of the custody

proceeding that left Plaintiff with 'four nights out of every ten' with his son").

In the instant case, the child protective proceeding against Graham was dismissed with

prejudice. As in *Green*, the only "judgment" against the plaintiff was the temporary order of

protection that deprived him of contact with his son. Plaintiff does not seek relief from these

orders, but compensation for the harms they, together with other official acts, wrought. Under

*Green*, these claims are not barred by *Rooker-Feldman*.

### VI.   Claims Against ACS Dismissed

ACS is an agency of the City of New York and cannot be sued independently. N.Y. City.

Charter, Ch. 17 § 396 ("All actions and proceedings for the recovery of penalties for the

violation of any law shall be brought in the name of the city of New York and not in that of any

agency, except where otherwise provided by law."); *see also, e.g., Emerson v. City of New York*,

740 F. Supp. 2d 385, 396 (S.D.N.Y. 2010). Plaintiff concedes that claims against ACS should be

dismissed. Pl.'s Mem. 49.

### VII.   Claims Against the City of New York, Janet Caesar, and Dr. Treacy Are Without Merit

#### A. Federal Claims

Graham raises claims under 18 U.S.C. § 1983 and the United States Constitution. To

establish a constitutional violation under section 1983, a plaintiff must show that: 1) the

defendants were acting under color of state law; and 2) this action constituted a deprivation of a constitutional or federal statutory right. *See, e.g., Hayut v. State Univ. of New York,* 352 F.3d 733, 743–44 (2d Cir. 2003).

Graham alleges that the defendants, including Dr. Treacy, were acting under color of state law. Compl. ¶ 22. This claim is taken as true for the purposes of this motion. He has failed, however, to plead sufficient facts to state a claim for the violation of his rights. Because no basis for a federal claim has been stated, the issues of municipal liability and qualified immunity need not be decided.

### 1. Due Process

Government actions that restrict a parent's contact with his child implicate fundamental rights. "Choices about marriage, family life, and the upbringing of children are among associational rights the Court has ranked of 'basic importance in our society,' . . . rights sheltered by the Fourteenth Amendment against the State's unwarranted usurpation, disregard, or disrespect." *M.L.B. v. S.L.J.,* 519 U.S. 102, 116 (1996) (internal citations and quotations omitted); *see also Duchesne v. Sugarman,* 566 F.2d 817, 824 (2d Cir. 1977) (holding that it is "beyond peradventure" that the "existence of a private realm of family life which the state cannot enter has its source not in state law, but in . . . intrinsic human rights" (internal citations and quotation marks omitted)). Parents have a "fundamental liberty interest . . . in the care, custody, and management of their child[, which] does not evaporate simply because they have not been model parents or have lost temporary custody of their child." *Santosky v. Kramer,* 455 U.S. 745, 753 (1982). This includes the right of parents not to be forcibly separated from their children. *See Quilloin v. Walcott,* 434 U.S. 246, 255 (1978) ("We have little doubt that the Due Process Clause would be offended '[if] a State were to attempt to force the breakup of a natural family,

15

over the objections of the parents and their children, without some showing of unfitness and for

the sole reason that to do so was thought to be in the children's best interest.'"); *Duchesne,* 566

F.2d at 825 ("[T]he most essential and basic aspect of familial privacy [is] the right of the family

to remain together without the coercive interference of the awesome power of the state.").

Parental rights are implicated when a child is temporarily removed from the custody of a

parent and placed in foster care on an emergency basis or for all or part of the duration of a child

protective proceeding. *See, e.g., Tenenbaum v. Williams,* 193 F.3d 581 (2d Cir. 1999).

Government actions other than removal may also implicate important rights. In the

instant case, the temporary orders of protection forbade the plaintiff from having *any* contact

with his son for more than a year, and significantly limited their contact for several years. These

orders, procured at the request of ACS, adversely affected Graham's vital rights as a parent.

"The liberty interests of parent and child in continued care and companionship has both

procedural as well as substantive elements." *Kia P. v. McIntyre,* 2 F. Supp. 2d 281, 290

(E.D.N.Y. 1998), *aff'd,* 235 F.3d 749 (2d Cir. 20000). Plaintiff raises both claims. *See* Pl.'s

Mem. 20-27. Here, neither element was trespassed upon. Graham received full procedural

protections from the Family Court before he was significantly deprived of his right to interact

with his son. That court found—after an appropriate inquiry—that a sufficient basis existed to

issue the temporary orders of protection preventing Graham from seeing his son. Nor were his

substantive due process rights violated.

### a. Procedural Due Process

Procedural due process is designed to reduce the possibility that the government will

infringe on protected interests unnecessarily. *Kia P.,* 235 F.3d at 759 ("'[P]rocedural due

process rules are shaped by the risk of error inherent in the truthfinding process as applied to the

16

generality of cases.'") (quoting *Mathews v. Eldridge,* 424 U.S. 319, 344 (1976)).  To determine whether there have been sufficient procedural protections before an individual is deprived of a liberty interest, courts rely on the test stated in *Mathews v. Eldridge,* assessing: 1) "the private interest that will be affected by the official action;" 2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards;" and 3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail."  424 U.S. at 335.

"As a general rule . . . before parents may be deprived of the care, custody or management of their children without their consent, due process—ordinarily a court proceeding resulting in an order [approving,] permitting[, or ordering] removal—must be accorded to them." *Tenenbaum,* 193 F.3d at 593 (citing *Stanley v. Illinois,* 405 U.S. 645 (1972).  Similar process is due when the government action substantially restricts a non-custodial parent's relationship with the child.

The proceedings in this case complied with due process.  Graham was present at the Family Court hearing when it issued the first temporary order of protection denying him contact with JGR.  At that hearing, he was represented by counsel who could have argued that such an order was unnecessary.  Pl.'s Aff. Ex. C (Family Court Docket Entry for May 11, 2006).  He was free to appeal the temporary order of protection, yet failed to do so.  Additional process would not have produced a different result.

Since Graham's procedural due process rights were not violated, this claim must be dismissed.

b. **Substantive Due Process**

17

Unlike procedural due process, substantive due process comes into play when, regardless of the procedures followed, a governmental decision or action violates a fundamental right and no overridingly important state interest justifies that infringement. *See Daniels v. Williams,* 474 U.S. 327, 331 (1986) (Substantive due process rights bar "certain government actions regardless of the fairness of the procedures used to implement them . . . ."); *Joyner by Lowry v. Dumpson,* 712 F.2d 770, 777 (2d Cir. 1983). A plaintiff seeking to prevail on such a claim must establish that the infringement on his liberty interest to be with his children is "so shocking, arbitrary, and egregious that the Due Process clause would not countenance it even were it accompanied by full procedural protection." *Anthony v. City of New York,* 339 F.3d 129, 143 (2d Cir. 2003).

In light of the "compelling governmental interest in the protection of minor children," the Court of Appeals for the Second Circuit "has adopted a standard governing case workers which reflects the recognized need for unusual deference in the abuse investigation context. An investigation passes constitutional muster provided simply that case workers have a 'reasonable basis' for their findings of abuse." *Wilkinson v. Russell,* 182 F.3d 89, 104 (2d Cir. 1999) (internal citations and quotations omitted); *see also van Emrik v. Chemung County Dep't of Social Services,* 911 F.2d 863, 866 (2d Cir. 1990).

Discretion is not unlimited. The government must conduct a sufficient investigation into the alleged neglect or abuse it relies upon to establish a reasonable basis for its action. *Nicholson v. Williams,* 203 F. Supp. 2d 153, 251 (E.D.N.Y. 2002) (citing *Croft v. Westmoreland County Children & Youth Servs.,* 103 F.3d 1123, 1126 (3d Cir. 1997) (holding that the child welfare agency must independently corroborate a report of abuse from an anonymous informant in order to separate a child and parent)); *Strail v. Dep't of Children, Youth and Families of Rhode Island,* 62 F. Supp. 2d 519, 529 (D.R.I. 1999) ("[T]he due process clause will certainly be offended if

children are taken away from their parents without sufficient investigation.")).  Moreover,

"[c]ase workers [are not] free to substantiate a claim of abuse . . . by ignoring overwhelming

exculpatory information or by manufacturing false evidence." *Wilkinson,* 182 F.3d at 104; *see*

*also Estiverne v. Esernio-Jenssen,* --- F.Supp.2d ----, 2011 WL 6754069, at *11 (E.D.N.Y. 2011)

(holding that defendant doctor was not entitled to summary judgment where plaintiff produced

evidence that he "both ignored significant exculpatory evidence *and* manufactured a false or

reckless diagnosis").

"[M]ere failure to meet local or professional standards" or "a faulty investigation does

not necessarily rise to the level of an unconstitutional investigation." *Wilkinson,* 182 F.3d at 106.

In *Wilkinson,* for example, child protective services relied on statements by the subject children

that their father had abused them, as well conclusions by the children's psychiatrist in

substantiating the abuse allegation. *Id.* at 105-06.  The court noted that the "children gave

conflicting signals as to whether their father had abused them," and that one child equivocated on

whether the allegations against the father were true or were coached by the mother. *Id.* at 105.

Many of the child's statements supporting the conclusion of abuse were in response to leading

questions by the agency investigator. *Id.* at 93-94.  Some of the child's claims were also

objectively implausible. *Id.* at 94 ("[The child] described an incident in which his father 'cut

[his] eye out,' leaving [him] with only 'one eye.' . . . [The investigator] conceded at trial that this

claim was 'a bit fantastic,' he had no explanation for failing to follow up on the child's bizarre

comments beyond the fact that 'it was clear that he had both eyes.'").  The Court of Appeals for

the Second Circuit concluded that the government's actions were constitutional, despite

significant flaws in the investigation:

> It appears that [the investigator] should have been considerably more thorough in
> his work. [The child], by his express claims of coaching by his mother, raised

significant doubt as to the likelihood of abuse, and that doubt was compounded by the absence of any medical evidence (particularly given the invasive types of physical abuse . . . described). Nevertheless, [the investigator] interviewed [the child] only once, used leading questions, and did not fully explore the child's comments suggesting possible maternal coaching. Furthermore, instead of seeking corroboration from additional witnesses, or from an independent psychiatrist or from elsewhere, [the investigator] spoke only to . . . a child psychiatrist who had met with the children only two or three times.

Despite these assorted problems, we conclude that defendants had a reasonable basis for their substantiation determination and that they therefore did not violate plaintiffs' constitutional rights. . . . [E]ven with its deficiencies, the [child protective] investigation generated significant information supporting a finding of abuse. In our view, this evidence was sufficient—though marginally—to establish the requisite reasonable basis for defendants' substantiation determination to comport with plaintiffs' constitutional right to family integrity.

*Id.* at 106.

Plaintiff in this case alleges that the Family Court petition filed against him was not supported by the facts and was actually motivated by the City Defendant's desire to retaliate. ACS caseworkers cannot initiate a child protective proceeding for the purpose of retaliation. While no cases have been identified addressing the effect of a retaliatory motive in the context of a substantive due process violation, plaintiff's claim can be analogized to an allegation of First Amendment retaliatory arrest or prosecution. In child protective proceedings, ACS occupies a position analogous to that of a police officer, conducting the investigation of the parent and collecting evidence in support of potential abuse or neglect charges.

ACS [also] occupies the role of prosecutor when it initiates an Article 10 petition for neglect against a [parent]. Prosecutors enjoy broad discretion in the conduct of their office. *See, e.g., U.S. v. Armstrong,* 517 U.S. 456, 465 . . . (1996) ("[C]ourts are properly hesitant to examine the decision whether to prosecute.") (internal quotations and citations omitted). Nevertheless, the discretion to prosecute is not absolute; it "is subject to constitutional constraints." *Id.* at 464, 116 S.Ct. 1480 (quoting *U.S. v. Batchelder,* 442 U.S. 114, 125 . . . (1978)). Discretion extends only so far as "the prosecutor has probable cause to believe that the accused committed an offense defined by statute." *U.S. v. Bonnet–Grullon,* 212 F.3d 692, 701 (2d Cir. 20000) (quoting *U.S. v. Armstrong,* 517 U.S. at 464, 116 S.Ct. 1480).

20

*Nicholson*, 203 F. Supp. 2d at 246. Much as police officers or prosecutors cannot abuse the

powers of their office to retaliate against an individual by arresting or prosecuting them without

probable cause, neither can child protective services retaliatorily deprive a father of his parental

rights. A reasonable basis for proceeding must exist—considering all exigencies such as the

dangers to a child of delay.

Allegations of retaliatory motive, on their own, may be insufficient to establish

constitutional violations where caseworker actions are otherwise supported by a reasonable basis.

In First Amendment retaliation cases:

> [U]pon a prima facie showing of retaliatory harm, the burden shifts to the
> defendant official to demonstrate that even without the impetus to retaliate he
> would have taken the action complained of . . . . If there is a finding that
> retaliation was not the but-for cause [for the action], the claim fails for lack of
> causal connection between unconstitutional motive and resulting harm, despite
> proof of some retaliatory animus in the official's mind.

*Hartman v. Moore*, 547 U.S. 250, 260 (U.S. 2006) (internal citations and quotations omitted). In

the context of retaliatory arrests and prosecutions, a showing of probable cause can rebut the

inference that animus was the but-for cause of the government action. *See id.* at 261

("[E]stablishing the existence of probable cause will suggest that prosecution would have

occurred even without a retaliatory motive."); *see also Curley v. Village of Suffern*, 268 F.3d 65,

73 (2d Cir. 2001) (Where "defendants had probable cause to arrest plaintiff, an inquiry into the

underlying motive for the arrest need not be undertaken."). In the case of a child protective

investigation, the existence of a reasonable basis for the filing of a Family Court petition is

sufficient to demonstrate that the government action would have been taken even in the absence

of some retaliatory motive.

In light of the presumption of regularity attributed to state judicial proceedings, an

intervening independent judicial determination that a reasonable basis exists for limiting the

exercise of parental rights generally cleanses any subsequent infringement of unconstitutional taint. *See Southerland v. City of New York*, --- F.3d ----, 2012 WL 1662981, at \*21-22 (2d Cir. 2012), *amending and superseding* 667 F.3d 87 (2d Cir. 2012), *reh'g en banc denied* --- F.3d ---- (2d Cir. 2012). The Court of Appeals for the Second Circuit has held that, where a child has been wrongfully removed on an emergency basis, "once . . . 'court confirmation of the basis for removal' is obtained, . . . any liability for the continuation of the allegedly wrongful separation of parent and child can no longer be attributed to the officer who removed the child." *E.g., id.* at 21. Only if a plaintiff can show that the government's request for removal or an order of protection was summarily approved by the Family Court on the basis of false or greatly flawed ACS representations, or that the judicial proceeding was otherwise substantially tainted, will a court-ordered separation be found to infringe on a parent's substantive due process rights. *Compare id.* at 22 ("Although the [plaintiff's children] continued to be separated from [him] even after the post-removal confirmation proceeding, in light of the presumption of regularity that we attribute to state judicial proceedings, . . . and in light of [his] failure to proffer any evidence tending to rebut that presumption, we cannot conclude that the continued separation of [plaintiff] from his children following the judicial confirmation proceeding is fairly attributable to" the caseworker.); *with Estiverne*, 2011 WL 6754069, at \*11 (finding that the fact that "the Family Court granted ACS's petition, thereby 'confirming' that there existed a reasonable basis for removal, does not mandate" dismissal of plaintiff's substantive due process claim "when the facts upon which the judicial tribunal relies are themselves false or misleading, court confirmation will not 'suffice to show that the caseworker's conduct had an objectively reasonable basis'" (internal citations and alterations omitted)); *and Nicholson*, 203 F. Supp. 2d at

251 ("The removals of abused mother's children, even when summarily approved by a court based on ACS representations, infringe on mothers' substantive due process rights.").

For the purposes of this motion, plaintiff's allegation that the City Defendants filed the petition in order to retaliate against him will be assumed to be true—though nothing, in fact, supports them. There is not the slightest suggestion of malice as a motive for Caesar's actions. *See* Tr. of Hr'g, May 7, 2012.

Even if the investigation was, like that in *Wilkinson*, seriously flawed, the facts as pled in the complaint establish that the City Defendants had a reasonable basis to request a temporary order of protection. Coercion or coaching of a child to falsely accuse his mother of abuse could be found to constitute abuse or neglect of the child. *See, e.g., Matter of John A. v Bridget M.,* 791 N.Y.S.2d 421, 429 (1st Dep't 2005) (Tom, J.P. & Friedman, J., concurring) ("It is psychologically abusive for a parent to plant in the mind of a three- or four-year-old child the false notion that the other parent is sexually abusing the child."); *David K. v Iris K.,* 714 N.Y.S.2d 297, 298 (1st Dep't 2000) (finding, in custody determination, that making "false allegations of sexual misconduct" is "inconsistent with the best interests of the child"). The Family Court judge directed ACS to investigate whether a petition against Graham should be filed when the allegations of coaching first came to light. In light of the considerable deference afforded to caseworkers, JGR's statement of coaching that could have reasonably been found credible by a caseworker provided a sufficient basis for the City Defendants to request that the court temporarily restrict his access to the child. When combined with the expert's, Dr. Treacy's, confirmation of coaching, the facts were sufficient to justify the filing of the petition against the plaintiff.

In view of the uncontroverted facts, it is implausible to suggest that the City Defendants would not have taken these actions but for some vague retaliatory motive. "[A]ction colored by some degree of bad motive does not amount to a constitutional tort if that action would have been taken anyway." *Hartman*, 547 U.S. at 260.

In any event, the separation of Graham from his son was not effectuated by the defendants directly. The temporary orders of protection depriving plaintiff of his right to contact with his son were issued by the Family Court for good cause. *See* N.Y. Fam. Ct. Act § 1029(a). Plaintiff does not assert that the evidence the court relied on in issuing these orders were false; he only claims that they did not provide a sufficient basis for depriving him of a parental right. The Family Court disagreed. In the absence of any allegations of substantial irregularities in the Family Court proceeding, the intervening, independent judicial determination—the actual cause of the plaintiff's deprivation—absolves the defendants of liability.

Even where the *Rooker-Feldman* doctrine does not apply, comity to state court activities is essential if the Administration for Children's Services and the Family Court are to fulfill their appropriate functions. The limitation on Graham's contact with JGR may possibly have been unnecessarily prolonged due to inefficiencies within ACS and the Family Court system. Nevertheless, plaintiff cannot show a violation of his substantive due process rights.

### 2. Unreasonable Search and Seizure

Plaintiff claims that "[d]efendants' commencement and continuation of the Family Court proceeding and the pursuit of the interim/temporary orders of protection barring and/or restricting his contact with JGR violated his Fourth Amendment right to be free from unreasonable searches and seizures." Pl.'s Mem. 27. He argues that the Family Court orders denying him contact with JGR constituted a "seizure" of the plaintiff, and that the child

24

protective investigation constituted a "search." *Id.* *See also* Tr. of Hr'g, May 7, 2012 (arguing that ACS' failure to investigate the claims against Graham or JGR's mother for a year while the temporary order of protection prevented plaintiff from seeing his son constituted a seizure). This claim is without merit.

The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV. "A 'seizure', triggering the Fourth Amendment's protections occurs . . . when government actors have, 'by means of physical force or show of authority . . . in some way restrained the liberty of a citizen.'" *Graham v. Connor,* 490 U.S. 386, 395 n. 10 (1989); *see also, e.g., Gardiner v. Incorporated Village of Endicott,* 50 F.3d 151, 155 (2d Cir. 1995) (stating that an individual is seized if, under the circumstances presented, "a reasonable person would have believed he was not free to leave"). A search occurs if the government intrudes upon a subjective expectation of privacy that society is willing to recognize as objectively reasonable. *See, e.g., Katz v. United States,* 389 U.S. 347, 351–52 (1967).

A Family Court order of removal is the equivalent of a warrant for Fourth Amendment purposes. *Tenenbaum,* 193 F.3d at 602; *see also Kia P.,* 235 F.3d at 762 ("[T]he Fourth Amendment applies in the context of the seizure of a child by a government-agency official during a civil child-abuse or maltreatment investigation."). A claim arising out of the removal of a child without probable cause can thus raise constitutional concerns. *See, e.g., Nicholson v. Scoppetta,* 344 F.3d 154, 172 (2d Cir. 2003). Parents have standing to challenge a search of their residence pursuant to a child protective investigation. *See Southerland,* 667 F.3d at 103.

25

Fourth Amendment rights, however, are personal rights that cannot be asserted vicariously. *See Alderman v. United States,* 394 U.S. 165, 174 (1969); *Tenenbaum,* 193 F.3d at 601 n. 13. While a Fourth Amendment claim may be brought by a parent on behalf of a child, parents do not have their own Fourth Amendment right to be free from a child's court-approved removal. *Southerland,* 667 F.3d at 103 ("A Fourth Amendment child-seizure claim belongs only to the child, not to the parent."); *P.C. v. Conn. Dep't of Children and Families,* 662 F. Supp. 2d 218, 231 (D. Conn. 2009) (holding, as a matter of law, that parents do not have a Fourth Amendment right to be free from a child's removal and may bring Fourth Amendment claims only on the child's behalf); *see also Tenenbaum,* 193 F.3d at 601 n. 13 (declining to challenge district court's holding that parents "did not have standing to bring a Fourth Amendment claim in their own behalf with respect to the State's treatment of" their daughter).

The temporary orders of protection procured from the Family Court at the City Defendants' request did not constitute a seizure under the Fourth Amendment. Although he was prevented from seeing his son, Graham was otherwise at liberty. The court orders did not significantly limit the plaintiff's freedom of movement, nor is any case cited in which a seizure was found on analogous facts. While they may have infringed on plaintiff's liberty interest in maintaining the integrity of his family, this is not the liberty of movement—physical freedom— that the Fourth Amendment protects. Even if JGR would have a claim for his seizure by ACS, which the plaintiff could raise a Fourth Amendment claim on his behalf, JGR's seizure did not violate *plaintiff's* Fourth Amendment rights.

Nor is a child protective investigation a Fourth Amendment "search." While the plaintiff may have a privacy interest in excluding the state from interfering in his familial relations, the family is not a "zone of privacy"—a physical space—for which a warrant based on probable

cause is required. The complaint does not allege any incident in which the defendants

impermissibly searched plaintiff's "person[], house[], papers, [or] effects." U.S. Const. amend.

IV; *cf. Southerland*, 2012 WL 1848360, at *15-17 (finding that child protective services

caseworker was not entitled to summary judgment or qualified immunity for making alleged

misrepresentations in affidavit used to procure a warrant for search of parent's home).

No relief may be granted on this claim.

### 3. Malicious Prosecution

Generally, the elements of a federal claim for malicious prosecution under § 1983 are

borrowed from the underlying analogous claim under state law. *Cook v. Sheldon,* 41 F.3d 73, 79

(2d Cir. 1994). The federal cause of action for malicious prosecution is more limited in scope

than the equivalent claim under New York law. While New York recognizes the tort of civil

malicious prosecution, a claim for malicious prosecution under § 1983 may only arise where

there has been a violation of the plaintiff's Fourth Amendment rights. *Washington v. County of*

*Rockland*, 373 F.3d 310, 315-16 (2d Cir. 2004); *see also Albright v. Oliver,* 510 U.S. 266, 273-

75 (1994) (holding that plaintiff's malicious prosecution claim arises under the Fourth

Amendment rather than substantive due process). No claim for malicious prosecution lies where

the plaintiff was "never taken into custody, imprisoned, physically detained or seized within the

traditional meaning of the Fourth Amendment." *Washington*, 373 F.3d at 316; *see also Singer v.*

*Fulton County Sheriff,* 63 F.3d 110, 116 (2d Cir. 1995) (Since "[t]he Fourth Amendment right

implicated in a malicious prosecution action is the right to be free of unreasonable seizure of the

person— *i.e.,* the right to be free of unreasonable or unwarranted restraints on personal liberty,"

"[a] plaintiff asserting a Fourth Amendment malicious prosecution claim under § 1983 must . . .

show some deprivation of liberty consistent with the concept of 'seizure.'"). The Court of

Appeals for the Second Circuit has noted that "it is unlikely that a civil proceeding . . . would implicate constitutional rights in a manner that would warrant redress under § 1983." *Washington*, 373 F.3d at 117.

Since the plaintiff's Fourth Amendment rights were not violated, *see* Part VII(A)(1), no claim for malicious prosecution lies.

### 4. Equal Protection

Plaintiff claims, for the first time, in his opposition to this motion that he "was treated differently on numerous occasions than other similarly situated parents" since the defendants selectively enforced the child protections laws because of his complaints regarding their failure to investigate the abuse allegations against his wife. Pl.'s Mem. 30.

The Equal Protection Clause requires that the government treat all similarly-situated individuals essentially alike. *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). "Although the prototypical equal protection claim involves discrimination against people based on their membership in a vulnerable class, we have long recognized that the equal protection guarantee also extends to individuals who allege no specific class membership but are nonetheless subjected to invidious discrimination at the hands of government officials." *Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001). To establish a claim based on selective enforcement, a plaintiff must show: 1) that he was selectively treated compared with others similarly situated; and (2) "that such differential treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." *Harlen Assocs.*, 273 F.3d at 499-500.

In the instant case, Graham fails to plead sufficient facts to satisfy the first prong. He does not allege in the complaint a single instance in which a child protective proceeding was not

initiated against a parent under similar factual circumstances. The only statement to that effect—a conclusory remark in his opposition papers—is unsupported by any authority. The initial temporary order of protection was requested by the defendants after JGR accused his father of coaching him to fabricate the abuse allegations against his mother. The petition against the plaintiff was filed, and additional orders of protection requested, after the Family Court judge encouraged ACS to look into filing a claim against him and after JGR's statement that his father coached him was corroborated by Dr. Treacy's report. As noted above, *see* Part VII(A)(1)(b), the defendants had a reasonable basis to initiate these proceedings. Without any further contentions to bolster the unlikely assertion that ACS would not request an order of protection or file a child protective petition against other parents under similar facts, the claim that Graham was selectively prosecuted is not "plausible on its face." *Twombly*, 550 U.S. at 570.

This claim must be dismissed.

## B. Supplemental Jurisdiction Over State Law Claims

Jurisdiction will not be exercised over pendent state-law claims. *See, e.g., Marcus v. AT&T Corp.*, 138 F.3d 46, 57 (2d Cir. 1998) ("In general, where the federal claims are dismissed before trial, the state claims should be dismissed as well."). The parties have not yet expended substantial resources in this litigation on state claims, and the case is not nearly trial-ready. *See, e.g., Purgess v. Sharrock*, 33 F.3d 134, 139 (2d Cir. 1994) (upholding district court's decision to exercise supplemental jurisdiction over state law claims where "[t]he parties and the court had spent years preparing for this trial in federal court; the jury had heard evidence for several days and was ready to begin its deliberations; and it would have been wasteful to subject this case to another full trial before a different tribunal").

The state law claims are dismissed without prejudice.

29

VIII.   **No Amendment of Pleadings Permitted**

The temporary orders of protection prohibiting plaintiff from seeing his son arguably

infringed on his parental rights. Yet the facts alleged do not state a plausible claim that this

denial was procured for unconstitutional reasons or through improper means, or that the

prohibition on contact was wrongfully prolonged.

As noted above, defendants submitted the full case records from the underlying ACS

investigation and Family Court action. Both plaintiff and Mrs. Caesar testified at the May 7,

2012 hearing. While the facts revealed in these records and at the hearing are not relied upon in

deciding the present motion, they demonstrate that there is no point in permitting an amendment

to the complaint or converting the motion to one for summary judgment. A fair reading of the

evidence in the record indicates that the City Defendants had a reasonable basis for requesting

the orders of protection and initiating proceedings against him.

The records reveal that the relationship between Graham and JGR's mother was not

amicable. *E.g. id.* at NYC 000010 ("Mother stated . . . she will not allow [Claude] Graham to

run her life. Mother said . . . his father would go to his school or day care and pick up child

without her permission. Mother said she went into court and get an order for father Mr. Graham

not to removed [JGR] from any school. . . . . Mother . . . was generally furious at what she states

is the child's father's harassment [sic] of the family."); *id.* at NYC 000011 ("Mother stated she

gets angry when Claude interfere with her parenting of her child. Mother said she has new man

in her [life] for the past three years with new baby and Claude try to make her life hell. Mother

said Mr. Graham told her he wants to have his woman back."); *id.* at NYC 000014 ("Mother said

she did get telephone call from Mr. Graham stating she will be arrested by the police because he

knows people in high places.").

30

On May 24, 2005—before the events at issue in this case—an initial accusation was called in against JGR's mother. Decl. of Eric Porter Ex. A at NYC 000006 (ACS Case File), Doc. Entry 25, May 2, 2012. From the very first interview with JGR on May 31st, the child told the caseworker that his father coached him to lie about being abused. *Id.* at NYC 000011 ("[JGR] told worker his father came up to school and tell him that he should tell the police and workers that his mother beats him. [JGR] said he does not like to lie on his mother for no reason. . . . [JGR] said he loves his mother but he [is] sad when his father tells him to lie."). ACS closed the investigation after determining that the charges were unsubstantiated and were likely the result of conflict between Graham and JGR's mother. *Id.* at NYC 000016 ("All reported allegations are unsubstantiated. The father has been harassing mother regarding the custody/visitation issue with his son. Mother was initially irate and uncooperative but has since met with the worker and assisted with the investigation. There is no need for services nor further ACS involvement."); *see also id.* at NYC 000013-14 ("Mr. Graham said he will meet with a detective very soon so he can tell them what type of mother [JGR's mother] is to her children. . . . Cps worker met detective Frawley from Special Victim Squad regarding the father Mr. Graham. Detective stated Mr. Graham has been calling his office every day for past two weeks. Detective said he told Mr. Graham there is no criminality on this family base[d] on his investigation. He stated the father is harassing the mother . . . to make her life sad. Detective said he will put a stop to the father[,] Mr. Graham['s], behavior [harassing] the mother with her new boyfriend. Detective Frawley stated the father[,] Mr. Graham[,] was warn[ed] not to call the mother with any new allegation . . . . Father was told he could be arrested if he continue to make false report[s] on the mother with her three children. Detective said he will close his case based on the children['s] stories.").

As described in Graham's complaint, a charge of abuse was again called in against JGR's mother in March 2006. The initial reporter appears to have been motivated by malice. *Id.* at NYC 000031 (reporting that individual's "main goal as he stated was 'to get that woman, because she keeps having my son locked up'"); *id.* at NYC 000034 ("The source who is a relative called in the case following the arrest of the father for violating an order of protection issued against him to the mother. The source complained [about] being upset with the mother for having the father thrown in jail so many times. There ha[ve] been two unsubstantiated reports last year with similar allegations.").

In April 2006, ACS was forwarded an anonymous letter (which Graham says was written by his wife) sent to the Mayor's Office, the ACS Commissioner and Deputy Commissioner, and the New York City Office of Children & Family Services with further allegations of abuse and neglect against JGR's mother. *Id.* at NYC 000034; Tr. of Hr'g, May 7, 2012. As the investigation progressed, Graham tried to amplify the allegations against JGR's mother. *Id.* at NYC 000042 ("Mr. Graham stated that he had a lot of information about [JGR's mother], and the things that she has done to [JGR], and the other children. Mr. Graham proceeded to pull out a big brown envelope which contained pictures, journals, and information on [JGR's mother]."). The caseworker did not credit his allegations in light of inconsistencies in his story and JGR's revelation that Graham coached him to claim he was abused. *Id.* Between August 22, 2006 and September 28, 2006, three additional reports alleging substantially the same allegations against JGR's mother were lodged. *Id.* at NYC 000132. The caseworker noted that "[t]he children are emotionally distressed at having to be questioned so frequently about allegations they all claim [are] untrue." *Id.*

Based on the pleadings and all of the record evidence, it is highly improbable that the plaintiff could show, on summary judgment, that the defendants were motivated by malice and not by valid concerns about Graham's potentially corrosive relationship with his son. Nor could the plaintiff draft a more persuasive complaint than he has.

Permission to replead is denied.

IX.   **Conclusion**

Plaintiff's federal claims against all defendants are dismissed on the merits. The state claims are dismissed without prejudice. While Dr. Treacy has not moved to dismiss, such a motion is deemed made and granted. No costs and disbursements are awarded.

SO ORDERED.

Jack B. Weinstein
Senior United States District Judge

Dated: June 14, 2012
          Brooklyn, New York

33